**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| In re: | * | Case No.  25-12714-BFK |
| **PERRY EVERETT ADLER**, | * | |
| | * | Chapter 11 |
| Debtor. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| **AMARYLLIS, INC**, | * | |
| | * | |
| Plaintiff. | * | |
| | * | |
| v. | * | Adversary No. |
| | * | |
| **PERRY EVERETT ADLER**, | * | |
| | * | |
| Defendant/Debtor. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**COMPLAINT TO DETERMINE
DISCHARGEABILITY OF DEBT**

Amaryllis, Inc. ("Amaryllis"), by counsel, hereby files this complaint (the "Complaint"), pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), and 11 U.S.C. § 523(c)(1), and Fed. R. Bankr. P. 4007 and 7001(6), against Perry E. Adler ("Debtor"). Amaryllis seeks a determination that Debtor's debt to Amaryllis caused by his fraudulent conduct is non-dischargeable. Debtor violated his fiduciary duties as Amaryllis's Chief Financial Officer to steal millions of dollars, misused his corporate credit accounts for personal use, and concealed the evidence.

Upon discovering this behavior, Amarylis sued the Debtor[1]. Subsequently, the parties dismissed the litigation pursuant to the terms of a settlement agreement. Perhaps predictably, the

---

[1] *See Amaryllis, Inc. v. Adler*, No. CV DKC 25-732, 2025 WL 1809720 (D. Md. July 1, 2025) (case dismissed without prejudice by stipulation on September 12, 2025).

Debtor continued his willful misconduct by breaching the aforementioned settlement agreement and commencing the instant bankruptcy case. For the reasons set forth herein, the Court should find the Debtor's debts to Amarylis non-dischargeable under the Bankruptcy Code.

## PARTIES AND JURISDICTION

1. Amaryllis is a District of Columbia corporation with its principal office at 3701 West Street, Landover, Maryland 20785, and is authorized to conduct business in Maryland.

2. Debtor is an individual and represents that he resides at 6528 Cavalier Drive, Alexandria, VA 22307; a property that he owns. *See, e.g.,* Dkt. 01 at 1.

3. Debtor is also the owner of that certain real property commonly known as 33425 W Cowboy Clint Way, Seligman, Arizona 86337. *See, e.g,.* Dkt. 19 at 3.

4. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §527 and 1334. This is a core proceeding and this Court has authority to enter final judgments pursuant to 28 U.S.C. § 157(b)(2)(I) and (O). To the extent this Court does not have authority to enter a final judgment on this matter, Amaryllis consents to this Court's entry of a final judgment.

5. Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND FACTS

### A. General Background

6. Amaryllis was incorporated as a privately held floral and event design business by the filing of Articles of Incorporation with the Secretary of the District of Columbia, recorded March 2, 1989.

7. Amaryllis has since grown into a leading full-service event design firm producing high quality events throughout the East Coast.

8.      Amaryllis hired Debtor as its Chief Financial Officer ("CFO") in 2014.

9.      Prior to becoming Amaryllis's CFO, Debtor worked for years as a corporate controller for various companies in which he oversaw accounting and financial functions.

10.     Debtor acted as Amaryllis's CFO for over 10 years until his termination in early 2025.

11.     As CFO, Debtor was responsible for managing Amaryllis's finances, accounting functions, payroll employee, benefits functions, and compliance.

12.     Debtor directly interacted with Amaryllis's accounting firm and was the primary individual designated at Amaryllis to do so.

13.     Debtor personally and directly managed all of Amaryllis's financial and credit accounts, including, but not limited to, Bank of America credit card accounts for several Amaryllis employees (the "Company Credit Accounts"), Amaryllis's Bank of America checking account (the "Company Checking Account"), Amaryllis's accounts with third parties, such as The Home Depot, Marriott, and Enterprise (collectively with the Company Credit Accounts and the Company Checking Account, the "Corporate Accounts").

14.     Debtor directly reported to Amaryllis's owner.

15.     Debtor was responsible for and regularly accessed and used the Corporate Accounts.

16.     Until shortly before his termination, Debtor was the only individual at Amaryllis who maintained login credentials for the Corporate Accounts.

17.     Between 2018 through 2024 Debtor established several of the Company Credit Accounts in his own name (collectively, the "Adler Credit Accounts").

18. Due to Debtor's position as CFO and employment responsibilities, the Adler Credit Accounts had credit limits substantially greater than the credit limits of most other Company Credit Accounts, which was intended to allow him to facilitate larger transactions for Amaryllis.

19. Amaryllis's policy has been that employees are required to only use their Company Credit Accounts for legitimate business reasons and must promptly reimburse Amaryllis for any personal expenses charged to their Company Credit Accounts.

20. Debtor was responsible for enforcing such Company Credit Accounts policies.

21. Amaryllis's practice has been to hold weekly meetings (the "Weekly Meetings") amongst its leadership to verbally discuss important items, such as upcoming events.

22. The Weekly Meetings served as the primary mechanism for Debtor to keep Amaryllis's executive management updated about financial affairs.

23. The Weekly Meetings were generally not reduced to writing.

24. Debtor generally did not provide written reports about Amaryllis's finances at the Weekly Meetings.

25. Amaryllis's executive management also held a yearly review (the "Yearly Reviews") with Debtor to discuss the status of financial affairs.

26. The Yearly Reviews were generally not reduced to writing.

27. Debtor rarely provided written reports about Amaryllis's finances at the Yearly Reviews and what reports he did provide were falsified or inaccurate.

28. Due to his fiduciary duties as CFO, Amaryllis's executive management expected Debtor to provide true, complete, and accurate financial information regularly throughout the calendar year and act solely in Amaryllis's best interests.

### B. *Events Preceding Discovery of the Fraud*

29.     Amaryllis experienced success in the initial years of Debtor's employment as CFO, with its events garnering features in the New York Times, Washingtonian, Vogue, Architectural Digest, People, Vanity Fair, and many others.

30.     However, in recent years, particularly after the COVID-19 pandemic, Amaryllis began experiencing financial difficulties.

31.     These financial difficulties gradually increased over time despite Amaryllis's services being in high demand and receiving positive feedback from high-profile clients.

32.     At the Weekly Meetings and the Yearly Reviews, Debtor consistently attributed Amaryllis's financial difficulties to market changes, such as increased labor and materials costs.

33.     As Amaryllis's financial situation became more dire, particularly throughout 2023 and 2024, Amaryllis increased its sales and operations seeking to overcome the purported expense increases, in reliance of Debtor's representations that Amaryllis's increasing expenses were legitimate.

34.     Amaryllis's increased sales and customer commitments initially distracted executive management from investigating the information that Debtor was providing at the Weekly Meetings and Yearly Reviews.

35.     Debtor encouraged Amaryllis to increase its sales and operations to better conceal his fraudulent activity and increase his potential for personal gain.

36.     Debtor also encouraged Amaryllis to incur debt to better conceal his fraudulent activity and increase his potential for personal gain.

37.     For several years leading up to 2025, Debtor falsely represented at the Weekly Meetings and Yearly Reviews that Amaryllis's reduced profit margin was due to increasing legitimate business expenses such as growing costs for labor and materials.

38.     Debtor frequently offered excuses blaming Amaryllis's expenses and made vague promises that he would improve profitability.

39.     As Amaryllis's concerns grew, it began requesting that Debtor provide written analyses and more details of its expenses and financial status.

40.     Debtor intentionally avoided providing written analyses of Amaryllis's expenses or financial status to avoid scrutiny of his activity.

41.     When asked directly about Amaryllis's finances, Debtor made innumerable false or misleading representations between 2018 and 2025.

42.     Debtor made such representations intentionally to perpetuate and conceal his fraudulent scheme that was costing Amaryllis dearly.

### C.  Discovery of the Fraud

43.     Upon information and belief, Debtor went to Southeast Asia in February of 2025 for vacation and to undergo elective medical procedures such as liposuction.

44.     While Debtor was out of office in February of 2025, Amaryllis's President accessed one of the Adler Credit Accounts online, which reflected Debtor's monthly spending records.

45.     Debtor's misuse of several of the Corporate Accounts became quickly apparent, although its full extent is still under investigation.

46.     Debtor's fraud scheme with the Corporate Accounts was simple; he brazenly charged personal expenses to the Adler Credit Accounts and paid off these expenses periodically with lump sums that he transferred from the Company Checking Account.

47.     Debtor did not deposit personal funds in the Company Checking Account to reimburse Amaryllis for his numerous personal expenses that he charged to the Adler Credit Accounts.

48.     Instead of legitimate business expenses for Amaryllis, Debtor used the Adler Credit Accounts to pay for, among other things, luxury goods, medicine, pets, travel, and household expenses, including his travel to and activities in Southeast Asia during February of 2025.

49.     The vast majority of these charges could not possibly be for company purposes.

50.     Debtor made these charges as if Amaryllis's funds were his own.

51.     Debtor conducted his fraudulent scheme carefully to ensure that payroll needs were generally met, the credit limit for the Adler Credit Accounts was not exceeded, and he had sole management of all Corporate Accounts involved for his transactions.

52.     Debtor hid his fraudulent conduct by limiting other Amaryllis employees from accessing the Corporate Accounts.

53.     Debtor also changed the mailing address for the Adler Credit Accounts' monthly statements to avoid the discovery of his fraudulent conduct.

54.     To exemplify Debtor's pattern of fraudulent conduct, without limitation, below are just a few selected transactions from the Adler Credit Accounts, specifically the account ending in 4271 ("Account 4271"), over the first two weeks of February of 2024:

a. On February 1, 2024, Debtor charged $3,542.11 at Hermès, a luxury fashion house in Paris, France; Debtor charged $967.69 over three transactions at Nordstrom, a department store; and Debtor charged $360.00 at Dudes Boutique, a custom fashion clothing boutique.

b. On February 3, 2024, Debtor charged $3,177.27 at Gyu Shige Japanese BBQ & Bar, a Japanese restaurant in Fairfax, Virginia.

c. On February 4, 2024, Debtor charged $6,572.00 at the Gucci store at Tysons Galleria; Debtor charged $17,899.90 at the Louis Vuitton at Tysons Galleria; Debtor charged $4,626.90 at the Prada in McLean Mall; Debtor charged $906.09 at Southeast Impression, a Southeast Asian restaurant in Fairfax, Virginia; Debtor charged $524.33 at the Ritz Carlton at Tysons Corner; and Debtor charged $173.00 at China Boy, a Chinese restaurant in Washington, D.C.

d. **On February 5, 2024, Debtor made two online payments from the Company Checking Account to Account 4271 totaling $20,000.00.**

e. **On February 6, 2024, Debtor made an online payment from the Company Checking Account to Account 4271 totaling $5,000.00;** Debtor charged $1,773.80 at the CVS Pharmacy in Alexandria, Virginia.

f. **On February 7, 2024, Debtor made an online payment from the Company Checking Account to Account 4271 totaling $10,000.00;** Debtor charged $123.63 at Life's Abundance, Inc., a pet food supplier; Debtor charged $5,840.60 at Prada; Debtor charged $463.50 at Top Dogg, LLC, a pet care company; and Debtor charged $41.37 for Starlink Internet.

g. On February 8, 2024, Debtor charged $100.34 at 1799 Prime Steak & Seafood, a restaurant in Alexandria, Virginia; and Debtor charged $845.84 at Advance Auto Parts.

h. On February 7-11, 2024, Debtor charged dozens of transactions on Amazon generally ranging between $5-150;

i. On February 9, 2024, Debtor charged $18.01 for Amazon Music; and Debtor charged $412.32 at the Morrison House Old Town Alexandria, a four star Marriott hotel.

j. On February 10, 2024, Debtor charged $424.94 at Westside Lilo's Cafe, an American restaurant in Seligman, Arizona.

k. On February 12, 2024, Debtor charged $334.75 at Top Dogg, LLC, a pet care company; and Debtor charged $1,788.12 over two transactions at a CVS Pharmacy in Alexandria, Virginia.

l. On February 13, 2024, Debtor charged $9,000.00 to Brandon Exotic, an exotic animal pet store with a location in Virgina; Debtor charged $1,791.70 to American Airlines for personal flights; Debtor charged $2,254.00 to American Modern Insurance, a home insurance provider; and Debtor charged $74.00 for the Horse World Expo, an equestrian industry trade show.

m. On February 14, 2024, Debtor charged $1,801.33 over two transactions at a CVS Pharmacy in Alexandria, Virginia.

55. None of the charges specifically identified above were authorized by Amaryllis, for a legitimate business purpose, or reimbursed by Debtor.

56. A true and accurate copy of the Cardholder Statement from January 26, 2024 to February 25, 2024 for Account 4271, evidencing the charges set forth above, is attached hereto as **Exhibit 1**.

57. In just February of 2024, Debtor spent over $100,000.00 in unreimbursed personal charges to Account 4271 and made numerous transfers from the Company Checking Account to pay off these charges.

58. The foregoing fraudulent charges are but a sampling for one of the Adler Credit Accounts, of which there are at least eight between 2018 to 2025.

59. **Debtor's fraudulent conduct abusing the Adler Credit Accounts and the Company Checking Account between 2018 and 2025 cost Amaryllis more than $4,500,000.**

60. After discovering Debtor's misconduct, Amaryllis began reviewing its financial records seeking to determine the scope of its damages caused by Debtor.

61. Amaryllis has discovered that Debtor fraudulently executed three business loan agreements with National Funding, Inc. on January 10, 2024, July 22, 2024, and September 11, 2024 (collectively, the "Fraudulent Business Loans"), respectively, in the total principal amount of $775,000, on behalf of Amaryllis, without Amaryllis's permission or authority

62. Debtor executed the Fraudulent Business Loans to fund his fraud scheme.

63. Debtor caused Amaryllis damages in the approximate amount of $163,999.52 due to interest unnecessarily accrued on the Fraudulent Business Loans.

64. Debtor also fraudulently executed a future receipts sale agreement with Forward Financing LLC on September 11, 2024 (the "Fraudulent Receipt Sale Agreement"), on behalf of Amaryllis, without Amaryllis's permission or authority, causing Amaryllis to sell $217,500 of its future income at a discounted purchase price of $150,000.

65.   Debtor executed the Fraudulent Receipt Sale Agreement to fund his fraud scheme.

66.   Debtor caused Amaryllis damages in the approximate amount of $67,500 in lost profits due to the Fraudulent Receipt Sale Agreement.

67.   Debtor's misconduct has forced Amaryllis to take out additional loans to continue operating, separate from the Fraudulent Business Loans and Fraudulent Receipt Sale Agreement.

68.   Additionally, on May 5, 2024, Debtor executed a payroll change order to give himself a substantial raise without authorization from Amaryllis.

69.   Amaryllis promptly terminated Debtor's employment after discovering his fraudulent scheme.

### D. Lawsuit and Settlement Agreement

70.   On March 5, 2025, Amaryllis filed a civil action against Debtor in the U.S. District Court for the District of Maryland (Southern Division), Case No 8:25-cv-00732, seeking judgment in its favor for fraud (Count I), conversion (Count II), negligence (Count III), and breach of fiduciary duty (Count IV), plus punitive damages (the "Lawsuit").

71.   After significant negotiations with Debtor, Amaryllis dismissed the Lawsuit without prejudice by stipulation on September 12, 2025, pursuant to a Settlement Agreement dated August 23, 2026 (the "Settlement Agreement"). A true and accurate copy is attached hereto as **Exhibit 2**.

72.   Debtor was represented by competent legal counsel throughout the Lawsuit and in negotiation and execution of the Settlement Agreement. *See, e.g., Id.* at 9, ¶ 15.e. ("Adler has been represented by independent legal counsel of his choice throughout all negotiations which have preceded and included the execution of this Agreement, and Adler has entered into and

-11-

executed this Agreement upon the advice of said independent counsel."); *id.* at 11, ¶ 27 (identifying same counsel for notice purposes).

73.     Notably, Debtor agreed in the Settlement Agreement to repay Amaryllis at least $3,900,000, *id.* at 1, ¶ 2, granted Amaryllis various security interests in his real and personal property, *id.* at 5, ¶¶ 5-6, authorized Amaryllis to confess judgment against Debtor upon default, *id.* at 5, ¶ 4, *id.* at 18, ¶ 10, and authorized Amaryllis to recover reasonable attorneys' fees incurred to enforce the Settlement Agreement's terms. *Id.* at 18, ¶¶ 9-10.

74.     The consideration from Amaryllis in exchange for executing the Settlement Agreement was dismissing the Lawsuit and releasing its related claims subject to Debtor's full and complete performance under the Settlement Agreement. *Id.* at 6, ¶ 10.

75.     Debtor's primary obligations under the Settlement Agreement may be summarized as follows: Debtor was obligated to promptly liquidate his assets, including his real properties at 6528 Cavalier Drive, Alexandria, VA 22307 (the "VA Property") and 33425 W Cowboy Clint Way, Seligman, Arizona 86337 (the "AZ Property") and the personal property thereon, transfer the net proceeds to Amaryllis on or before January 1, 2026, and thereafter pay Amaryllis the remaining balance of his indebtedness under the Settlement Agreement by monthly payments over a five-year period. *See id.* at 2-5, ¶ 2; *id.* at 16, ¶ 1.

76.     Prior to and after execution of the Settlement Agreement, the VA Property was in substantial disrepair and distress as an apparent "hoarder house," which Debtor intentionally concealed from Amaryllis to induce execution of the Settlement Agreement by inflating its perceived value as collateral.

77.     Prior to and after execution of the Settlement Agreement, the AZ Property was subject to a boundary dispute with the adjacent property owner, impacting its marketability and

clarity of title, which Debtor intentionally concealed from Amaryllis to induce execution of the Settlement Agreement by inflating its perceived value as collateral.

78.    Debtor has breached the Settlement Agreement in numerous ways, such as withholding or providing false information to Amaryllis material to his real and personal property, defaulting on his obligations to his VA Property mortgage lender,[2] and failing to pay Amaryllis when and as due under the Settlement Agreement.

79.    Debtor filed this bankruptcy case on December 29, 2025, as a shameless attempt to escape two impending deadlines:

   a. The VA Property was scheduled for sale by a foreclosure auction on December 30, 2025 due to Debtor's prolonged mortgage non-payment.

   b. Debtor's payment deadline to Amaryllis was January 1, 2026 and Debtor had not met the criteria for an extension thereto pursuant to the Settlement Agreement.

80.    Debtor also admitted under oath on January 30, 2026, during the first 341 Meeting of Creditors, that he filed this bankruptcy case to avoid the VA Property's foreclosure sale.

81.    Debtor has misused the legal system to delay his payment and performance obligations.

82.    Amaryllis's claim against Debtor is secured in part by the VA Property and AZ Property for at least $3,900,000 pursuant to the Settlement Agreement. *See* Ex. 2 a 5-6.

83.    Amaryllis's total aggregate claims against Debtor substantially exceed $4,500,000 between the total damages that Debtor caused Amaryllis by his fraudulent conduct until his termination as CFO and his conduct after executing the Settlement Agreement.

---

[2] Debtor's VA Property mortgage lender is PHH Mortgage Corporation, a creditor in this bankruptcy case.

84.     Amaryllis's claim for reasonable attorneys' fees, that are recoverable pursuant to the Settlement Agreement, continues to accrue. *See, e.g.,* Ex. 2 at 18, ¶ 9.

85.     Debtor's indebtedness to Amaryllis was incurred due to his fraudulent conduct and breaches of his fiduciary duties.

### Claim I: Non-Dischargeability Under 11 U.S.C. § 523(a)(2)(A)
### (False Pretenses, False Representations, and Actual Fraud)

86.     Every allegation contained in the foregoing paragraphs is incorporated by reference as if set forth herein.

87.     Bankruptcy courts generally apply five elements to determine non-dischargeability of debt under 11 U.S.C. § 523(a)(2)(A): (1) a false representation by the debtor; (2) knowledge of its falsity; (3) intent to deceive; (4) justifiable reliance by the creditor; and (5) proximate damage caused by the reliance. 2 Bankruptcy Law Manual § 8:7 (5th ed.) ("Exceptions to discharge—Debts incurred by fraud").

88.     Debtor made numerous intentional false representations to Amaryllis regarding the causes of its financial distress (including attributing it to legitimate business expenses and market conditions) and his proper management of the Corporate Accounts.

89.     Debtor knew these representations were false and made them with the intent that Amaryllis rely upon them to conceal his diversion of Amaryllis funds and continue his scheme.

90.     Debtor stole millions from Amaryllis through thousands of unauthorized and unreimbursed transactions using the Adler Credit Accounts and the Company Checking Account.

91.     Debtor fraudulently concealed his unauthorized execution of the Fraudulent Business Loans and the Fraudulent Receipt Sale Agreement.

92.     Debtor fraudulently concealed having given himself a raise.

93.      Debtor fraudulently concealed from Amaryllis his misuse of the Corporate Accounts, the Fraudulent Business Loans, the Fraudulent Receipt Sale Agreement, and his unauthorized self-awarded raise, to enrich himself at Amaryllis's expense.

94.      Due to Debtor's status as CFO with all appurtenant fiduciary duties, Amaryllis justifiably relied on Debtor's representations and concealment, including by not investigating the true causes of financial distress, increasing operations based on purported expense pressures, continuing Debtor's employment, and depositing client payments into accounts Debtor misappropriated.

95.      After his frauds as CFO were discovered, Debtor induced Amaryllis to execute the Settlement Agreement by concealing the VA Property's state of disrepair and the AZ Property's boundary dispute and cloud on title.

96.      Amaryllis justifiably relied on Debtor's representations about his assets that induced execution of the Settlement Agreement because the Settlement Agreement was negotiated at length through counsel, Ex. 2 at 9, ¶ 15, and Debtor executed a personal financial statement in connection with the Settlement Agreement setting forth his assets and liabilities under penalties of perjury. *See id.* at 61-70.

97.      Debtor's fraudulent inducement of Amaryllis to execute the Settlement Agreement has caused and is causing Amaryllis substantial damages in attorneys' fees for enforcement of its terms.

98.      Amaryllis has sustained losses exceeding $4,500,000 as a direct and proximate result of Debtor's fraudulent misrepresentations, fraudulent inducement, and actual fraud.

99.      Pursuant to 11 U.S.C. § 523(a)(2)(A), the debt owed by Debtor to Amaryllis is non-dischargeable.

**Claim II: Non-Dischargeability Under 11 U.S.C. § 523(a)(4)**
**(Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny)**

100. Every allegation contained in the foregoing paragraphs is incorporated by reference as if set forth herein.

101. Bankruptcy courts generally apply 11 U.S.C. § 523(a)(2) to prohibit a debtor from discharging any debts arising from the debtor's fraudulent conduct while acting in a fiduciary capacity "based on a technical or express trust," or any debts arising out of the debtor's embezzlement or larceny "regardless of whether the debtor was acting in a fiduciary capacity at the time of the misconduct." 2 Bankruptcy Law Manual § 8:9 (5th ed.) ("Exceptions to discharge—Fraud or defalcation while acting in a fiduciary capacity, embezzlement, larceny").

102. Debtor, as Amaryllis's CFO, owed fiduciary duties arising from his position and responsibilities over Amaryllis's finances and accounts.

103. While CFO, Debtor misappropriated and diverted specifically identifiable Amaryllis funds by charging personal expenses to Adler Credit Accounts and paying those charges with funds transferred from the Company Checking Account, and by unilaterally increasing his own salary without authorization.

104. While CFO, Debtor violated his fiduciary duties by fraudulently executing the Fraudulent Business Loans and the Fraudulent Receipt Sale Agreement, causing Amaryllis to unnecessarily pay additional loan interest and lose profits.

105. Debtor's conduct was intentional, in reckless disregard of Amaryllis's rights, and carried out through concealment and abuse of his position and control over Amaryllis's accounts.

106. The foregoing constitutes fraud or defalcation while acting in a fiduciary capacity, and/or embezzlement or larceny within the meaning of 11 U.S.C. § 523(a)(4), and the resulting debt is non-dischargeable.

-16-

## Claim III: Non-Dischargeability Under 11 U.S.C. § 523(a)(6)
### (Willful and Malicious Injury)

107.    Every allegation contained in the foregoing paragraphs is incorporated by reference as if set forth herein.

108.    11 U.S.C. § 523(a)(2) excepts from discharge a debt incurred as a result of "willful and malicious injury by the debtor to another entity or to the property of another entity," which bankruptcy courts have generally interpreted to include conversion and other economic misconduct such as fraud. 2 Bankruptcy Law Manual § 8:11 (5th ed.) ("Exceptions to discharge—Willful and malicious injury").

109.    Debtor intentionally charged personal expenses to the Adler Credit Accounts and intentionally used Amaryllis's funds in its Company Checking Account to pay such charges, without authorization, justification, or reimbursement

110.    Debtor intentionally concealed VA Property's state of disrepair and the AZ Property's boundary dispute and cloud on title to induce Amaryllis to execute the Settlement Agreement.

111.    Debtor's intentional acts were undertaken with actual malice or, at minimum, in conscious disregard of Amaryllis's rights, and necessarily caused injury to Amaryllis's property interests in excess of $4,500,000

112.    The resulting debt is for willful and malicious injury to the property of another and is non-dischargeable under 11 U.S.C. § 523(a)(6).

## Claim IV: False Statements Within the Amended Schedules and the 341 Meetings
### (As to the Debtor's Assets)

113.    Every allegation contained in the foregoing paragraphs is incorporated by reference as if set forth herein.

114.   Debtor has made numerous false statements with respect to the animals that he owns (or owned), his income, and the value of his real properties.

115.   On January 23, 2026, Debtor first filed with the Court his schedule of assets and liabilities (the "First Schedule"). Dkt. 19.

116.   The First Schedule asserts that Debtor owns the following non-farm animals, 43 in total, the value of which the Debtor states are "Unknown:" "2 Water buffalo, 4 Watusi cattle steer, mini donkey, mini horse, 7 longhorn, Zebu, American Bison, as well as 3 black angus, 6 red angus, 3 bison, and 14 horses." *Id.* at 7.

117.   The First Schedule also asserts that Debtor has zero monthly income. *Id.* at 1.

118.   Debtor previously represented to Amaryllis in an executed personal financial statement that his livestock has a market value of $85,000. *See* Ex. 2 at 70.

119.   On January 30, 2026, at the first 341 Meeting of Creditors, Debtor conceded under oath that he owned substantially more animals than what was listed in his First Schedule, and that his neighbors in Arizona are paying for his services at their properties, which amounts are not reflected in his First Schedule.

120.   On February 20, 2026, at the second 341 Meeting of Creditors, Debtor conceded under oath that he had given away all of his animals without receiving their market value in exchange, dissipating bankruptcy assets, and that his neighbors in Arizona have continued paying him for his services.

121.   On March 2, 2026, Debtor filed with the Court an amended schedule of his assets and liabilities (the "Second Schedule"). Dkt. 31.

122.   The First Schedule and the Second Schedule are identical with respect to identifying the animals that Debtor owns. *Id.* at 5.

123.    The Second Schedule identifies that Debtor has a monthly income of exactly $1,000, which amount upon information and belief is inaccurate and understates Debtor's income.

124.    The First Schedule and Second Schedule both identify the VA Property with a current value of $650,000. Dkt. 19 at 4; Dkt. 31 at 2.

125.    Debtor conceded at each of the 341 Meetings of Creditors that the VA Property more accurately has a current value at or below $600,000 as it needs substantial repairs and cleanup.

126.    The VA Property's actual market value is substantially lower than $600,000.

127.    The First Schedule and Second Schedule both identify the AZ Property with a current value of $3,500,000. Dkt. 19 at 3; Dkt. 31 at 1.

128.    Debtor conceded at each of the 341 Meetings of Creditors that the AZ Property remains subject of an unresolved boundary dispute with the adjacent property owner.

129.    On March 15, 2025, Debtor's broker for the AZ Property estimated its value to be between approximately $826,200 to $2,233,800, without accounting for the boundary dispute.

130.    Debtor grossly overestimates value of the AZ Property in his schedules, in apparent disregard for its cloud on title by the boundary dispute, his own broker's estimated valuation, and actual market conditions.

131.    Debtor has yet to file another amended schedule of his assets and liabilities.

132.    Debtor made these assertions in his First Schedule, Second Schedule, and the 341 Meetings of Creditors, knowing they were false and with the intention to deceive as to the value of his assets.

## Conclusion

133.    **WHEREFORE**, Amaryllis requests that the Court enter judgment in its favor and against Debtor as follows: a) Determining, pursuant to 11 U.S.C. § 523(a)(2)(A), that the debt owed to Amaryllis arising from Debtor's false pretenses, false representations, and actual fraud is non-dischargeable; b) Determining, pursuant to 11 U.S.C. § 523(a)(4), that the debt owed to Amaryllis arising from Debtor's fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny is non-dischargeable; c) Determining, pursuant to 11 U.S.C. § 523(a)(6), that the debt owed to Amaryllis arising from Debtor's willful and malicious injury to Amaryllis and its property is non-dischargeable; d) Entering a money judgment in favor of Amaryllis and against Debtor in an amount to be determined at trial, but not less than $4,500,000, together with pre- and post-judgment interest, plus punitive damages; e) Awarding Amaryllis its costs of suit and reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/Joshua D. Bradley*
Joshua D. Bradley (Bar No. 83096)
Rosenberg Martin Greenberg, LLP
25 South Charles Street, 21st Floor
Baltimore, MD  21201
Telephone:  (410) 727-6600
Facsimile:  410-727-1115
Email: jbradley@rosenbergmartin.com
*Attorney for Amaryllis, Inc.*

## CERTIFICATE OF SERVICE

I, Joshua D. Bradley, do hereby certify that on March 31, 2026, the foregoing pleading was caused to be served via the Court's CM/ECF system and/or via email to all parties on record.

*/s/ Joshua D. Bradley*
Joshua D. Bradley

-20-